**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE**

Civil Case No. 08-cv-02049-LTB-MJW

JAMES N. LANGE, JR.,

    Plaintiff,

v.

BRANDI POWER, in her individual capacity,

    Defendant.
_____

**ORDER**
_____

THIS MATTER is before the Court on Defendant Brandi Power's Motion for Summary Judgment, filed December 16, 2009 (docket #117); Plaintiff's Response, filed January 25, 2010 (docket #128); Defendant's Reply, filed February 26, 2010 (docket #135). Oral argument will not materially aid resolution of the motion. For the reasons stated in this order, Defendant's motion is denied.

    I.    STATEMENT OF FACTS

There is considerable dispute over what happened during the June 18, 2008 incident leading to the search of James Lange Jr.'s vehicle. For purposes of reviewing Deputy Power's motion for summary judgment, I must consider the evidence in the light most favorable to the non-moving party. As a result, the Plaintiffs' account, as presented in affidavits, depositions and prior testimony, follows.

On the evening of June 18, 2008, Mesa County Deputy Brandi Power was patrolling Interstate 70, near Fruita, Colorado. Her job was drug interdiction and she was been trained in the same. Deputy Power observed a black SUV, proceeding west on Interstate 70, that did not appear to exhibit a rear license plate or registration tag. After confirming the SUV did not have a visible rear license plate or tag, she pulled the vehicle over. When contacted, the driver Tom Bornert indicated there was a registration on the front windshield and that the owner of the vehicle was seated in the passenger seat. Power requested Bornert's driver's license, registration and proof of insurance. The passenger, who identified himself as James Lange, retrieved the documents from the glove compartment and handed those documents to Deputy Power. Plaintiff included his driver's license in the documents given to Deputy Power without being asked to do so.

After confirming the Vehicle Identification Number ("VIN") on the papers matched the VIN on the vehicle, Power returned to her vehicle. While in her vehicle, she called in the driver license information for the driver's status. Dispatch reported to Deputy Power that Mr. Bornert's and Plaintiff's licenses were clear and valid. According to Lange, Deputy Power returned to the driver's side of the vehicle. She handed back the registration paperwork, but she retained Bonert's driver's license and she told them that they could not leave until her partner arrived. Deputy Miller then arrived on the scene.

Deputy Power briefly spoke with Deputy Miller and then requested that Bornert exit the vehicle and speak with her. Deputy Power questioned Bornert on why he was driving and why he was going to Las Vegas. Bornert told Power that Lange was going to Las Vegas for a few days for business. Bornert had clothes for the couple-day trip in

2

a plastic bag. Lange had a duffle bag in the car. Power asked Bornert and Lange if they were carrying illegal drugs, weapons, and/or large amounts of cash.

Deputy Power testified that she is unclear of the exact time Miller arrived on the scene and spoke to Plaintiff. She states that she was either in the car "running" the vehicle information or Miller arrived when she was speaking with Bornert. In her deposition, Power stated that Miller advised her that he had reasonable suspicion to run an exterior search of the vehicle. The reason articulated by Miller to support his determination of "reasonable suspicion" was that Lange's car had been seen at the home of a person being investigated for drug activity. Power told Bornert and Lange that they had to remain until her partner arrived.

Miller went directly to the passenger side of the car and spoke to Lange. Miller asked Lange about a recent arrest. Lange told Miller that he was confusing him with another person of the same name and that he had never been arrested for drugs. Mr. Lange has no criminal record, only having received violation notices for traffic offenses. In his deposition, Miller testified that, at that point, he knew he had entered the wrong "James Lange" in the database. Miller ordered Lange out of his car and into Power's custody.

During his dog search of the car, Miller ran the dog around the car many times, and seemed to be attempting to get the dog excited. Several times, Miller patted the car with his hand. The dog did considerable damage to the car when Miller encouraged it to get excited and jump on the car. After Miller's dog supposedly "hit" on drugs, Miller searched the interior of the car, the bags in the car, and proceeded to take the rear deck

of the car apart with a screwdriver. No drugs, money, or other suspicious items were found.

Meanwhile, as Miller was searching Lange's car, Lange borrowed Bornert's cell phone and placed a call to his father, a former Mesa County Sheriff's Office deputy. According to Power, Lange told his father that he did not "trust Miller" and that "[Miller] was illegally searching his vehicle." At that point, Power stated that Lange was nervous and pacing.

Mr. Lange's father, who was known to both Miller and Power as a former police officer, arrived at the scene. Mr. Lange Sr., told Power that the search of his son's car was illegal. He asked that a supervisor be called to the scene. Power refused, telling Lange Sr. he could call a supervisor himself. Lange Sr. pulled his vehicle to the front of the cars to prevent a safety hazard. He then watched the search from a distance. Power told Miller that Lange Sr., had arrived on the scene. Miller and Power then discontinued the search. Power advised Lange Sr. that it was her stop and that the stop was ending. After Miller left the scene, Bonert asked for a ride back to Grand Junction. Power searched Bornert and his belongings and gave him a ride back to Grand Junction. Power did not return Bonert's license to him until after the stop ended when she was driving him back to Grand Junction.

II. STANDARD OF REVIEW

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

4

Summary judgment is not proper if—viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in that party's favor—a reasonable jury could return a verdict for the non-moving party. *Mares v. ConAgra Poultry Co.*, Inc., 971 F.2d 492, 494 (10th Cir. 1992).

In a motion for summary judgment, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex, supra*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)). If this burden is met, then the non-moving party has the burden of showing there are genuine issues of material fact to be determined. *See id.* at 322. It is not enough that the evidence be merely colorable; the non-moving party must come forward with specific facts showing a genuine issue for trial. *See id.*; *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). I shall grant summary judgment, therefore, only if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Lucas v. Mountain States Tel. & Tel.*, 909 F.2d 419, 420 (10th Cir. 1990); Fed. R. Civ. P. 56(c).

In a motion for summary judgment, I view the evidence "through the prism of the substantive evidentiary burden." *Liberty Lobby, supra*, 477 U.S. at 254. The inquiry is based on "the quality and quantity of evidence required by the governing law" and "the

criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant." *Id.*

The doctrine of qualified immunity shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law. See *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009). This qualified immunity inquiry requires analysis of two distinct questions: (1) whether—taken in the light most favorable to the plaintiff as the party asserting the injury—the plaintiff alleges sufficient facts to show the public official's conduct violated plaintiff's constitutional rights; and (2) whether the constitutional right alleged to be violated was clearly established at the time of the alleged violation in a sufficiently analogous factual setting. See *Saucier v. Katz*, 533 U.S. 194, 201 (2001), abrogated in part by *Pearson*, 129 S. Ct. 808. While it is often desirable to proceed initially with the first prong, a finding of qualified immunity may be appropriate on either question. See *Pearson,* 129 S. Ct. at 818.

The determination of whether a right was clearly established within a sufficiently analogous factual setting must be made within the specific context of the case, not as a broad general proposition. Saucier, 533 U.S. at 201; see also *Medina v. City and County of Denver*, 960 F.2d 1493, 1497 (10th Cir. 1992). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina*, 960 F.2d at 1498. This does not mean the prior case law must have precisely the same facts, however, but rather requires a particularized inquiry to determine whether the contours of the right were sufficiently defined by prior case law such that "a reasonable official would understand

6

what he is doing violates that right." See *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004). If both inquiries can be met in the affirmative, then the defendant is not entitled to qualified immunity. See Saucier, 533 U.S. at 201.

III. ANALYSIS

"It is well-established that an automobile stop is subject to the Fourth Amendment imperative that guarantees the right to be free from unreasonable searches and seizures." *United States v. Broadway*, 580 F. Supp. 2d 1179, 1180 (D. Colo. 2008); *see United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1307 (10th Cir. 2006); *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005). Analyzing an automobile stop for reasonableness requires application of the two-part inquiry set forth in *Terry v. Ohio*. *See Bradford*, 423 F.3d at 1156 (*citing Terry v. Ohio*, 392 U.S. 1 (1968)). The *Terry* inquiry requires the Court to first ask whether the stop was justified at its inception. *See Bradford*, 423 F.3d at 1156. A stop will be justified at its inception only when the officer has, "based on all the circumstances, a 'particularized and objective basis for suspecting' the person stopped of 'criminal activity.'" *See United States v. Winder*, 557 F.3d 1129, 1133 (10th Cir. 2009) (*quoting United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).

If the Court determines the stop was justified initially, it must then inquire whether the scope of the stop was reasonably related to the circumstances which justified interference in the first place. *See Bradford*, 423 F.3d at 1156. "[A] seizure that is

7

lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). If, in the process of executing the stop, the officer becomes aware that no criminal activity is actually afoot, "termination of the encounter is required. . . . At this point, the detention is no longer reasonable, as the officer's concerns have proven illusory." *See Winder*, 557 F.3d at 1133 (*citing United States v. Peters*, 10 F.3d 1517, 1522 (10th Cir. 1993)).

The parties agree that the initial stop of the Plaintiff's vehicle was justified at its inception. The car owned by Mr. Lange did not have a registration or license tag on the back, appearing to violate Colorado law. Thus, I will focus on Defendant's actions subsequent to the initial stop and whether the scope of the stop was reasonably related to the circumstances which justified interference in the first place. "An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning." *United State v. McRae*, 81 F.3d 1528, 1534 *citing United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir.). "Detention beyond that time period is only justified if the officer 'has a reasonable and articulable suspicion that illegal activity has occurred or is occurring ...[or] the initial detention has become a consensual encounter.'" *Id.* at 1483. Neither "inarticulable hunches," nor "inchoate and unparticularized suspicion," will suffice to justify an investigatory detention. *Terry v. Ohio*, 392 U.S. at 22*, 27.* "Common sense and ordinary human experience must govern over rigid criteria." *United States v.*

*Walraven*, 892 F.2d 972, 975 (10th Cir. 1989)(*quoting United States v. Sharpe*, 470 U.S. 675, 685, 105 S. Ct. 1568, L. Ed. 2d 605)(1985))

Defendant asserts that the continued detention, further questioning and performing the license and vehicle registration check did not violate the Fourth Amendment. Further, she asserts she had reasonable suspicion to continue the stop and inquire of Bonert regarding his travel plans. Defendant argues that her experience in drug interdiction combined with the lack of visible license, Bornert's behavior, and the fact that Plaintiff was not driving his new expensive new vehicle provided her with a sufficient basis for reasonable suspicion of criminal activity. Defendant contends that she was just following her normal traffic stop pattern when she asked the driver to exit the vehicle. While questioning Bornert, she learned that he did not know why he was driving, that they were traveling to Las Vegas for indefinite purposes, for an indefinite time, and that Bornert had minimal luggage.

Plaintiff asserts that the stop should have ended when Power determined that there was no violation because the vehicle was properly displaying a Nevada registration tag on the lower right front window. Plaintiff argues that his case is analogous to *United States v. McSwain*, 29 F.3d 558, 561-62 (10th Cir. 1994) and *U.S. v. Edgerton*, 438 F.3d 1043 (10th Cir. 2006). In *McSwain*, a Utah state trooper stopped the defendant's vehicle because he could not read the temporary registration tag posted in its rear window. 29 F.3d at 561. As the trooper approached the vehicle, he observed an unobscured Colorado temporary tag which appeared valid. *Id*. The Tenth Circuit agreed with the defendant that the trooper unduly prolonged a detention which ultimately led to the discovery of contraband. *Id*. Important to the court's reasoning,

9

was the fact that the trooper's reasonable suspicion regarding the validity of the defendant's temporary registration sticker was completely dispelled prior to the time he questioned the defendant and requested documentation. *Id.* at 562.

In *Edgerton*, a police officer stopped a vehicle because he could not read the temporary registration tag that had been placed in the car's rear window. 438 F.3d at 1045-46. After making the determination that the tag was valid, the officer requested the driver's license and registration and issued a warning ticket. *Id.* After giving the ticket, the officer got permission to search the car and eventually found cocaine in a secret compartment in the trunk of the car. *Id.* The Tenth Circuit found that the trooper in that case should have explained to defendant the reason for the initial stop and allowed her to continue on her way as the purpose of the stop was satisfied. *Id.*

Plaintiff notes that instead of letting Lange and Bornert leave after being shown the valid Nevada registration tag in the window, defendant Power (1) asked for driver's licenses and registration papers; (2) returned to her car to check out the papers and licenses; (3) received confirmation that both licenses were valid and clear; (4) returned to Lange's car; (5) told Lange and Bornert that they had to remain on the scene until her partner arrived; (6) asked Bornert to get out of the car, all in violation of his Fourth Amendment rights.

First I will address Plaintiff's claim Deputy Power unlawfully extended the duration of the stop beyond its limited scope once she identified the posting in the front window of a valid Nevada registration tag. Defendant asserts that this case may distinguished from *United States v. McSwain*, 29 F.3d 558 (10th Cir. 1994), because the underlying violation was not resolved, and was, instead, an unresolved violation

because of the failure to display registration in accordance with Colorado law, permitting continued contact. Defendant concedes that the display in the front windshield complied with Nevada law. Defendant cites to *People v. Altman*, 938 P.2d 142 (Colo. 1995) and *United States v. DeGasso*, 379 F.3d 1139 (10th 2004) as justification for continuing the stop after Deputy Power noted the properly displayed Nevada registration. But those cases are easily distinguishable from this case, in both cases the actual plates were still not clearly visible even after law enforcement approached the vehicle and was able to read the plates.

I find and conclude, viewing the facts in a light most favorable to Plaintiff, that Plaintiff has alleged sufficient facts to establish that Deputy Power's actions following the initial stop were in violation of his Fourth Amendment rights and exceeded the scope of the stop. At the moment Deputy Power stopped Lange's vehicle she was authorized to investigate the reasonable suspicion that Lange had violated the motor vehicle law. Prior to questioning Bonert and Lange, she learned that her initial suspicion was unfounded because the vehicle was properly displaying the Nevada registration in accordance with Nevada law. The purpose of the initial investigation had been satisfied, and absent any other basis for detention or questioning, Power's conduct in requiring Bonert and Lange to produce information without either reasonable suspicion or probable case was unwarranted.

Defendant goes on to argue that even with full faith and credit, compliance with sister state laws does not require ending a stop, as the law enforcement officer is not expected to have an encyclopedic knowledge of all states traffic and registration laws. *Citing United States v. Orduna-Martinez*, 561 F.3d 1134, fn. 2 (10th Cir. 2009).

I note, *in the very next sentence*, *in the exact same footnote*, the court states "[o]ther circuits have held that a trooper's reasonable mistake of law cannot make an otherwise impermissible stop reasonable." *citing United States v. Chantahasouxat*, 342 F.3d 1271, 1279 (11th Cir. 2003)("[A] mistake of law cannot provide reasonable suspicion or probable cause to justify a traffic stop." (*citing United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000); *United States v. Miller*, 146 F.3d 274, 278 (5th Cir. 1998))). Here, Power's mistake of law does not provide reasonable suspicion for her to continue the stop and further detain Plaintiff.

Having already determined that there is a material question of fact as to whether Power violated Plaintiff's Fourth Amendment rights by continuing the stop beyond a scope reasonably related to the circumstances which justified the stop in the first place, it is unnecessary for me to discuss whether there was reasonable suspicion to conduct the dog sniff search or search the interior of the vehicle. Finally, the parameters of the Fourth Amendment, with respect to the facts in this case, are clearly established.

It is therefore ORDERED that Defendant Power's motion for summary judgment is **DENIED**. It is

FURTHER ORDERED that the June 24, 2010 hearing is **VACATED**.

Dated: June __14__, 2010.

                                               BY THE COURT:

                                               ___s/Lewis T. Babcock___
                                               Lewis T. Babcock, Judge